FILED

2006 May-16 PM 02:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LENDA HICKS HOWZE, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:04-cv-1547-JHH |
| APAC SOUTHEAST, INC., | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the January 27, 2006 motion (doc. # 32) of defendant APAC Southeast, Inc. (APAC) for summary judgment. Pursuant to the court's January 31, 2006 and February 14, 2006 orders, the motion was deemed submitted, without oral argument, on May 5, 2006.

### I. Procedural History

Plaintiff Lenda Hicks Howze commenced this action on July 6, 2004 by filing a complaint in this court alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Plaintiff's complaint asserts that she was repeatedly denied promotions because of her race. Defendant's January 27, 2006 motion for summary judgment asserts that plaintiff

has failed to establish a prima face case for any of plaintiff's claims.

Defendant submitted a brief and evidence[1] (doc. # 33) in support of its own motion for summary judgment on January 27, 2006.  Plaintiff did not file a response in opposition to defendant's motion.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate

---

[1] The defendant submitted the following evidence: deposition of Lenda Howze; deposition of Tim Mullendore; reprimands regarding Lenda Howze; employment records of James Estell; new employee authorization of Turhan Moore; job descriptions; APAC Compensation Management Guide 2003; July 15, 2003 memorandum from Tim Mullendore; July 22, 2003 memorandum from Mary Day; employment application of Turhan Moore; bachelor of science diploma of Turhan Moore; new employee authorization form of Michael Chapman; bates stamped document 153 regarding Michael Chapman; bated stamped document 50 regarding Michael Chapman; bates stamped document 143 regarding Michael Chapman; employment application of Thomas Jackson; resume of Thomas Jackson; bates stamped document 008 regarding Thomas Jackson; bated stamped document 0053 regarding Thomas Jackson; employment application of Roy Mullendore; resume of Roy Mullendore; new employee authorization form of Roy Mullendore.

2

the absence of a genuine issue of material fact.  See id. at 323.  Once the moving

party has met its burden, Rule 56(e) requires the nonmoving party to go beyond

the pleadings and by its own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are

irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All

reasonable doubts about the facts and all justifiable inferences are resolved in

favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115

(11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge

its initial burden depends on whether that party bears the burden of proof on the

issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four

Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving

party bears the burden of proof at trial, then it can only meet its initial burden on

summary judgment by coming forward with positive evidence demonstrating the

absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the

4

movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[2]

#### A.  APAC

APAC is a division of Ashland Paving and Construction, which is owned by Ashland, Inc.  (See Mullendore Dep. at 104.)  In 1994, APAC had about 45 operating companies known as divisions.  (Id. at 105.)  Each division functioned as an independent and separate company with different rules for hiring, different accounting departments, and different sets of books.  (Id. at 105-06.)  Tim Mullendore, who has been employed with APAC since 1977, was the President of the Birmingham division of APAC.  (Id. at 9, 12-13, 105.)

---

[2] If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

Between 2002 and 2003, APAC went through a reorganization.  (Id. at 14-15.)  Five APAC divisions in Alabama – Birmingham, Huntsville, Ballew and Roberts, Montgomery, and Anniston-Hodges – were consolidated and became the Alabama Division of APAC.  (Id.)  Mullendore became the President of the Alabama Division of APAC.  (Id. at 14.)

Before the reorganization, job openings were not posted in the Birmingham division.  (Id. at 37.)  Generally, employees were made aware of job openings by word of mouth or by advertisements in the newspaper.  (Id. at 74-75.)  After the reorganization, job openings were posted on the website and advertised in the newspaper.  (Howze Dep. at 37, 72, 75-76.)

## B.  Howze's Employment with APAC

Howze began working for the Birmingham division of APAC in 1973 in the accounting department.  (Id. at 9, 16.)  Howze's job duties included payroll, billing, customer service requests, asphalt plant billing, accounting and balancing spreadsheets.  (Id. at 16.)  At the time of her hire, she had a high school diploma and two years of business training at Birmingham Business College, but she did not have a degree or certificate.  (Id. at 12.)  Her work experience was limited to jobs in customer service.  (Id. at 13-15.)  Howze has remained in the accounting department since her hiring.  (Id. at 17.)

Howze's current position is that of accounting clerk.  (Id.)  In this position, Howze handles the billing for FOB customers who purchase asphalt from APAC.[3] (Id.)  Howze has never been on a job site, and she does not have any construction experience.  (Id. at 69, 72.)  She does not decide prices and customers do not communicate with her regarding prices.  (Id. at 20, 23, 26.)  She has not had any sales experience at APAC, and customers do not ask her what type of asphalt to use.  (Id. at 22-23.)

### C.  Alleged Discrimination

Howze testified that she was denied promotions to the position of Birmingport terminal manager, estimator, and sales manager because of her race. (Id. at 51, 79.)  She acknowledged, however, that "no one ever made a racial slur or racial comment to [her] that [she] felt was discriminatory."  (Id. at 42.)

### 1.  Birmingport Terminal Manager Position

In the early to mid 1990s, the position of terminal manager became available at APAC's Birmingport Liquid Asphalt Terminal.  (Mullendore Dep. at

---

[3]  The billing process is as follows: FOB customers comes to the APAC plant and selects the type of asphalt.  The asphalt is weighed and a ticket is printed which reflects the price, amount, and type of asphalt.  An invoice is created at the same time.  Howze edits the ticket, if needed, checks the invoice to ensure the correct price is charged, and inputs the information into a computer.  Before 2003, Howze then printed and mailed the invoice to the customer.  After 2003, the information is transmitted to Atlanta and the invoice is mailed from Atlanta.  (Howze Dep. at 17-22.)

7

16.)  Mullendore established the following qualifications for the position: (1) responsibility because the facility opened at 2:00 a.m. and because the facility needed to be checked over the weekend; (2) work experience, including familiarity with the use and handling of liquid asphalt; (3) certification by the state as a certified technician to test the liquid asphalt.  (Id. at 23-26.)  The manager supervised two people.  (Id. at 23.)  Mike Estell was hired as the terminal manager.  (Id. at 26.)

## 2.  Estimator Positions

According to Howze, an estimator solicits business, talks to clients off-site, makes suggestions to customers regarding what type of mixtures and equipment to use, and handles bids.  (Howze Dep. at 28-29.)  Howze first inquired about an estimator position in 1997, after Mike Estell was promoted to estimator.  (Id. at 50, 59-60; Estell Employee Record, Def.'s Ex. D.)  Mullendore told Howze that the estimator position had been filled, and she then asked what the qualifications were.  (Mullendore Dep. at 38, 43-44.)

Before the reorganization, Mullendore and William Watkins, the Vice President of the Birmingham division, were responsible for deciding estimator qualifications at the Birmingham division of APAC.  (Mullendore Dep. at 40-41.)  There were no written, or posted qualifications.  Mullendore testified that the

8

qualifications were field experience, some cost accounting experience, and some practical construction experience.  (Id.)  Mullendore told Howze that she needed practical field experience to understand how projects worked from a financial standpoint, which would mean taking a field operations-type job.[4]  (Id. at 39, 87-89.)  Mullendore also told Howze that she could advance her chance of becoming an estimator by obtaining additional education, as some estimators had engineering degrees or degrees that related to construction activities.  (Id. at 45-46, 87.)

Howze next inquired about the estimator position in February 2003, when Estell became a sales manager, leaving an estimator position open.  (Howze Dep. at 50, 59.)  Howze initially testified that Mullendore told her that she needed a college degree to be an estimator.  (Id. at 59.)  She later testified, however, that Mullendore told her that she needed ten years of estimating experience.  (Id. at 61, 78-79, 137, 185-86.)  It is unclear from Howze's testimony whether Mullendore told her that both a college degree and ten years experience was required.

Michael Chapman received the position of estimator on February 1, 2003.  (Def.'s Ex. N.)  Chapman was originally employed by APAC in 1979; from 1988

_____

[4] Howze had only office experience; she did not have any field experience and had not been exposed to any of the field operations.  (Mullendore Dep. at 39.)

9

to June 1990, Chapman worked as a payroll clerk.  (Def.'s Ex. L & M.)  Chapman

then left APAC and received a B.S. in accounting from the University of Alabama.

(Def.'s Ex. N.)  He was rehired by APAC in November 1990 as an accountant.

(Def.'s Ex. L.)  He was promoted in 1993 to a senior accountant, and then became

the Director of Environmental Health and Safety in 1994 and 1995.  (Def.'s Ex. M

& O.)  He was a sales representative in 2002 when he was promoted to senior

estimator.  (Def.'s Ex. N.)

Howze's last inquiry regarding an estimator position was in July 2003, after

Turhan Moore was hired as an estimator.  (Mullendore Dep. at 47, 52.)  The

position was advertised in The Birmingham News.  (Id. at 172.)  Howze

approached Mullendore, told him she wanted the estimator position, and that

Moore was not qualified for the job.  (Id. at 47.)  Mullendore told her that Moore

was qualified.  (Id.)

Again, Howze asked Mullendore what the qualifications for estimator were.

There is a dispute of fact as to Mullendore's response.  Howze testified that

Mullendore told her she needed ten years experience.  (Howze Dep. at 53, 78-79,

185-86.)  She later testified that he also stated that she needed a college degree,

and that both a degree and experience were required for the position.[5]  (Id. at 79,

137.)

Mullendore testified that he read the written qualifications directly from the

2003 APAC Compensation Guide, which had been implemented since the

reorganization.  (Mullendore Dep. at 41, 47, 54.)  This guide described the basic

duties of an estimator and included minimum qualifications of 0-4 years of

construction experience and a bachelor's degree or relevant work experience.  (Id.

at 63-64; 2003 APAC Compensation Guide, Def.'s Ex. G.)  As such, Mullendore

explained to Howze that the estimator position "required either a formal education

or extensive previous experience in this field and she did not meet those

qualifications."  (7/15/2003 memo, Def.'s Ex. H.)  He also told Howze that there

were many jobs posted on the Ashland website, and that she could apply for any

job for which she thought she was qualified.  (Id.)  He also suggested pursuing

additional education to further her opportunities within the company.  (Id.)

Howze admitted at her deposition that she did not meet the current, written

requirements for the position of estimator, but stated that at the time she inquired

---

[5] Although Howze testified that Mullendore told her both were required for the estimator
position, her remaining testimony indicates that she may have been talking about the sales
manager position when stating both a college education and ten years experience were required.
(Howze Dep. at 79.)

about the position she was qualified.  (Howze Dep. at 54.)  Mullendore never considered Howze for an estimator position because she did not meet the basic qualifications.  (Mullendore Dep. at 109.)

### 3. Sales Manager Position

In February 2003, during the consolidation, the Vice President position was eliminated.  (Mullendore Dep. at 29.)  The Vice President of the Birmingham division, William Watkins, was offered the position of sales manager, when his position was eliminated.  (Id. at 30.)  The sales manager position was created by the reorganization.  (Id.)  Watkins declined the position and left the company.  (Id. at 30-31.)

Howze inquired about Watkins's job.  (Howze Dep. at 139.)  According to Mullendore, Howze approached him and stated that she "wanted Willie's job." (Mullendore Dep. at 29.)  Mullendore testified that he explained that the Vice President position had been eliminated and that no one would replace Watkins as Vice President.  (Id. at 29-30.)  He explained that the new position would be that of a sales manager and read her the qualifications from the 2003 APAC Compensation Management Guide.  (Id. at 29, 31, 34, 108.)

The 2003 APAC Compensation Management Guide stated that the position required a minimum of eight years construction/sales experience and more than six

12

years of supervisory experience.  (2003 APAC Compensation Guide, Def.'s Ex. G.)  It also required a bachelor's degree or related work experience.  (Id.)  The duties of sales manager included managing and supervising the sales activities of a division that generated less than $75 million in revenue.  (Id.)

As with the estimator position, Howze disputes Mullendore's testimony. Howze initially testified that Mullendore told her she needed a college degree to be a sales manager, later testified that he told her the position required ten years experience, and also testified that Mullendore stated that the position required both a college degree and ten years experience.  (Howze Dep. at 31, 35, 79, 140, 175.)  Howze asked to see a written description of the sales manager position, and Mullendore told her that she could find it on the company website.  (Id. at 31-32, 34.)  Howze did not go to the website, however, because she "did not trust" what Mullendore said.  (Id. at 32, 34.)  Howze never applied for the sales manager position in writing.  (Id. at 50.)

Mullendore informed Howze that she was not qualified for a sales manager position, and he did not consider her for the position.  (Mullendore Dep. at 29, 31, 34, 109.)  The position was ultimately awarded to Roy Mullendore.  (Id. at 31.) Roy Mullendore has a B.S. in Business Administration from Jacksonville State University.  (Mullendore Employment Application, Def.'s Ex. T.)  His

13

employment history included over ten years of sales experience, including supervisory experience.  (Id.)

## IV. Applicable Substantive Law

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfield v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Cmty. College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from

14

which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition); see also Bass v. Bd. of County Comm'rs, Orange County, Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct evidence" in the context of a Title VII race discrimination claim; "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination."). "Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Rojas v. Florida, 285 F.3d 1339, 1342, n.2 (11th Cir. 2001)(quoting Schoenfield v. Babbitt, 168 F. 3d 1257, 1266 (11th Cir. 1999))(citations and quotations omitted). Direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989); see also EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990).

Here, plaintiff has presented only circumstantial evidence of racial discrimination. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established

15

by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411

U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of</u>

<u>Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207

(1981)." <u>Combs</u>, 106 F.3d at 1527.  Under the <u>McDonnell Douglas</u> and <u>Burdine</u>

framework, the plaintiff first has the burden of establishing a prima facie case of

discrimination, which creates a rebuttable presumption that the employer acted

illegally.  <u>Id.</u> at 1527-28.  The methods of presenting a prima facie case, as well as

the exact elements of the case, are not fixed; rather they are flexible and depend to

a large degree upon the facts of the particular situation.  <u>See</u>, <u>e.g.</u>, <u>Nix v. WLCY</u>

<u>Radio/Rahall Commc'ns</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Lincoln v. Bd. of</u>

<u>Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff

establishes a prima facie case of disparate treatment employment discrimination by

showing that he or she was a qualified member of a protected class and was

subjected to an adverse employment action but that otherwise similarly situated

employees outside the plaintiff's class were treated dissimilarly.[6]  <u>See</u> <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. at 802 (hiring); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th

Cir. 1997) (discipline); <u>see also</u> <u>Nix</u>, 738 F.2d at 1185 (discipline); <u>Pittman v.</u>

---

[6] <u>See also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 n.13 ("The facts necessary will vary in
Title VII cases, and the specification above of the prima facie proof required from respondent is
not applicable in every respect in different factual situations.").

Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[7] See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[8]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.

_____

[7] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[8] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

17

Where plaintiff seeks to prove pretext by showing she was more qualified than the person given the job or promotion, she must show that the disparities between the successful applicant's and her own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004), cert. denied 126 S. Ct. 478 (2005) (citation omitted); see also Brooks v. County Comm'n of Jefferson County, Ala., __ F.3d __, No. 05-15201 (11th Cir. April 18, 2006); Ash v. Tyson Food, Inc., 126 S. Ct. 1195, 1197 (2005) (approving of language in Cooper). Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional

18

discrimination did indeed motivate the defendant or by producing sufficient

evidence to allow a rational trier of fact to disbelieve the employer's proffered

legitimate reasons, thus permitting but not compelling the trier of fact to make a

finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary

sufficient evidence by plaintiff will not always prevent the employer from

prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's

prima facie case, the probative value of the proof that the employer's explanation

is false, and any other properly considered evidence that supports the employer's

case are among other factors to take into account in evaluating a Rule 50 motion);[9]

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d

1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336

(11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-

Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th

Cir. 1993).

---

[9] The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

# V.  DISCUSSION[10]

Plaintiff contends that she was denied the following five promotions because of her race: (1) Birmingport Terminal Manager; (2) three different estimator positions; and (3) Sales Manager.   Defendant's motion for summary judgment asserts that plaintiff has failed to establish a prima face case for any of plaintiff's claims.  In the alternative, defendant argues that even if plaintiff established a prima facie case, she cannot show that defendant's legitimate, nondiscriminatory reason for its promotion decisions was pretext for race discrimination.  The court addresses plaintiff's claims separately.

## A.  Birmingport Terminal Manager Position

Howze testified in her deposition that she was denied the position of Birmingport Terminal Manager in the early to middle part of the 1990s.  (Howze Dep. at 79, 148.)  As APAC correctly notes, Howze did not assert this claim in her

---

[10] The court notes that defendant contends that plaintiff's complaint is brought pursuant to 42 U.S.C. § 1981.  Although plaintiff claims discrimination because of race, plaintiff's complaint does not assert a violation of § 1981.  Instead, the complaint alleges violations of Title VII only.  The court, therefore, does not address defendant's arguments regarding § 1981.  Luckily for defendant, because § 1981 and Title VII share the same requirements of proof and use the same analytical framework, the substantive arguments made by defendant regarding § 1981 also apply to claims brought under Title VII.  See, e.g., Shields v. Fort James Corp., 305 F.3d 1280, 1282-83 (11th Cir. 2002).  As another aside, even if plaintiff brought her claims under § 1981, the statute of limitations is four years, as established by 28 U.S.C. § 1658, not two years as argued by defendant.  See Jones v. R.R. Donnelly and Sons, Co., 541 U.S. 369 (2004).  As such, any claims arising under § 1981 prior to July 6, 2000, not July 6, 2002, would be barred by the statute of limitations.

complaint.  Howze also did not allege this claim in her EEOC charge.  "Any

claims not asserted in the plaintiff's Complaint are properly dismissed."  Cooper,

390 F.3d at 732 (citing Coon v. Ga. Pac. Corp., 829 F.2d 1563, 1568-71 (11th Cir.

1987)).[11]  As such, summary judgment is due to be granted on this claim.

## B.  Estimator Positions

Howze contends that she was denied three promotions to the position of

estimator.  First, she testified that she was denied a promotion in 1997, when

Estell was promoted to estimator.  Second, she contends that she was denied a

promotion to estimator in February 2003 before the reorganization.  Finally, she

testified she was denied a promotion to estimator in July 2003, after APAC's

reorganization.  The court discusses each promotion separately.

### 1.  1997

As a prerequisite to filing suit under Title VII, a plaintiff must file a timely

charge of discrimination with the EEOC.  Mitchell v. Jefferson County Bd. Of

Educ., 936 F.2d 539, 543 (11th Cir. 1991). "In Alabama, a non-deferral state, a

plaintiff must file a Title VII discrimination charge with the EEOC within 180

---

[11] Moreover, even if Howze included this position in her complaint, summary judgment would be appropriate because the denial of promotion occurred ten years before Howze filed her charge of discrimination.  This claim, therefore, is barred under Title VII's statute of limitations. See 42 U.S.C. § 2000e-5(e)(1); Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000).

days of the alleged violation." <u>Tipp v. AmSouth Bank</u>, 76 F.Supp.2d 1315, 1327

(S.D.Ala. 1998), <u>aff'd</u>,229 F.3d 1166 (11th Cir. 2000). Viewing the facts in the

light most favorable to Howze, April 1, 1997, the date Estell assumed the position,

was the latest date on which she could have been informed that she was denied

this promotion.  As her charge was not filed until November 4, 2003, this claim is

outside of the 180 day time period, and summary judgment is due to be granted on

this claim.

### 2. <u>February 2003</u>

Under the <u>McDonnell Douglas</u> framework, to prevail on a claim of failure to

promote, a plaintiff may establish a prima facie case of sex discrimination by

showing that: (1) she is a member of a protected class; (2) she was qualified and

applied for the promotion; (3) she was rejected despite her qualifications; and (4)

other equally or less qualified employees who were not members of the protected

class were promoted.  <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1253 (11th Cir.

2000).  The record establishes that Howze is a member of a protected class, she

applied for the position,[12] and the position was given to a male.[13]  APAC contends

---

[12] For purposes of summary judgment, APAC does not argue that Howze did not apply
for the position.  Instead, APAC assumes that "merely asking questions regarding the position"
qualifies as applying for the position.  (Def.'s Br. at 26.)

[13] APAC argues that Howze did not present evidence that anyone filled the estimator
position left open by Estell.  The court disagrees.  Reading the evidence in the light most

that Howze did not establish that she was qualified for the position and that an equally or less qualified male was promoted.

The record contains a dispute of fact as to what the qualification for the estimator position were when Howze was denied the promotion in February 2003. The requirements were not written, but were determined by Mullendore.  Howze testified that Mullendore told her she needed ten years estimating experience and/or a college degree.  (Howze Dep. at 59, 61, 78-79, 137, 185-86.)   Howze's testimony is unclear as to whether Mullendore told her both were required. Mullendore testified, however, that the qualifications were field experience, some cost accounting experience, and some practical construction experience. (Mullendore Dep. at 40-41.)  Mullendore also stated that, although not required, some estimators had engineering degrees or degrees that related to construction activities.  (Id. at 45-46, 87.)

Regardless of what the requirements were for the estimator position, Howze failed to establish that Chapman, the male hired for the position in February 2003, was equally or less qualified than she.  Howze had a high school diploma and two years of business training at Birmingham Business College, but she did not have a

---

favorable to Howze, the record establishes that Michael Chapman was promoted to an estimator position around the time that Estell left the position.  (Def.'s Ex. N.)  At the summary judgment stage, this evidence is sufficient.

degree or certificate.  (Id. at 12.)  Her work experience prior to her job at APAC was limited to jobs in customer service.  (Id. at 13-15.)  Howze has remained in the accounting department since her hiring at APAC.  (Id. at 17.)

In stark contrast, Chapman began his employment with APAC in 1979, and from 1988 to June 1990, Chapman worked as a payroll clerk.  (Def.'s Ex. L & M.) Chapman then left APAC and received a B.S. in accounting from the University of Alabama.  (Def.'s Ex. N.)  He was rehired by APAC in November 1990 as an accountant.  (Def.'s Ex. L.)  He was promoted in 1993 to a senior accountant, and then became the Director of Environmental Health and Safety in 1994 and 1995. (Def.'s Ex. M & O.)  He was a sales representative in 2002 when he was promoted to senior estimator.  (Def.'s Ex. N.)

Because the undisputed evidence does not establish that Chapman was equally or less qualified than she for the estimator position, Howze failed to establish a prima facie case of race discrimination.  As such, summary judgment is due to be granted on this claim.  It is also due to be granted because there is no evidence which " is of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Chapman] over the plaintiff."  Cooper, 390 F.3d at 732.

24

### 3.  July 2003

Howze also did not establish a prima facie case regarding the July 2003 estimator position.  The most fundamental reason Howze's claim fails is because Howze did not apply for the position.  Instead, the undisputed record establishes that Howze inquired about the position <u>after</u> Moore had been hired.  (Mullendore Dep. at 47, 52.)   Mullendore testified that Howze approached him, told him she wanted the estimator position, and that Moore was not qualified for the job.  (<u>Id.</u> at 47.)  There is no evidence in the record that Howze inquired about the position before Moore was hired.  There is also no evidence that Howze did not know about the open position.  Because the position was filled after the reorganization, the position was advertized in the newspaper and posted on the website.  As such, summary judgment is due to be granted as to this claim.[14]

### C.  Sales Manager Position

Finally, Howze claims that she was discriminated against when she was denied the promotion to the sales manager position awarded to Roy Mullendore.  APAC does not dispute that Howze is a member of a protected class or that the position was given to a male.  APAC contends that Howze did not establish a

---

[14] In addition, the undisputed evidence establishes that Howze was not qualified for the estimator position, as she had nowhere near the qualifications required, as listed in the 2003 APAC Compensation Guide.

prima facie case of discrimination because she did not apply for the position and because she was not qualified.

Howze cannot establish a prima facie case of discrimination because she was not qualified for the position. The requirements for the position were posted in writing on APAC's website and were contained in the 2003 Compensation Management Guide. That Howze testified that she believed the qualifications to be different than those listed does not create a genuine issue of material fact. She testified that she did not go to the website where the written requirements were posted. (Howze Dep. at 32, 34.) Her mistaken recollection of the requirements do not create a genuine issue of material fact as to what the actual requirements for the job were.

The requirements for the position were as follows: (1) a minimum of eight years construction or sales experience; (2) more than six years of supervisory experience; and (3) a bachelor's degree or related work experience. (2003 APAC Compensation Guide, Def.'s Ex. G.) The duties of sales manager included managing and supervising the sales activities of a division that generated less than $75 million in revenue. (Id.) Howze did not meet any of the three requirements. She did not have any construction or sales experience or supervisory experience. She also did not have a bachelor's degree or related work experience. The

26

undisputed facts simply do not establish that she was qualified for the position. As such, summary judgment is due to be granted on this claim.

## VI.  CONCLUSION

In summary, the court finds that no material issues of fact remain and that defendant APAC Southeast, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.

A separate order will be entered.

**DONE** this the <u>  16th  </u> day of May, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE